**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**CENTRAL DIVISION**
**FRANKFORT**

**CRIMINAL ACTION NO. 3:14-CR-10-S-GFVT**

**UNITED STATES OF AMERICA** **PLAINTIFF**

**V.** **UNITED STATES' SENTENCING MEMORANDUM**

**HENRY RAMER** **DEFENDANT**

* * * * *

Ramer has been convicted of 21 counts of mail fraud, one count of money laundering conspiracy, and one count of securities fraud, each of which can be punished by up to 20 years imprisonment. (R. 51, 307.) The United States requests that the Court impose a sentence of imprisonment within the range calculated under the U.S. Sentencing Guidelines.

## RESPONSES TO RAMER'S OBJECTIONS

**1.** The PSR properly increases Ramer's offense level by 18 points under § 2B1.1(b)(1)(J) because the loss amount from his offenses was between $2.5 million and $7 million. (PSR ¶ 52.) The jury acquitted Ramer of five mail fraud counts on or before July 10, 2013, and found Ramer guilty of 21 mail fraud counts on or after August 19, 2013. (R. 51, 307.) The individual victim losses beginning on and after August 19, 2013 total $2,617,534. Government's Trial Exhibit 293. "The prosecution has the burden to prove by a preponderance of the evidence that the [§ 2B1.1(b)(1)] enhancement applies"

but the defendant bears the "burden of proving the specific amount by which that amount should be reduced." *United States v. Washington*, 715 F.3d 975, 984-85 (6th Cir. 2013).

Ramer does not bear his burden by simply asserting that his involvement was only in "R&W Marketing" and Phase II of the scheme and citing Government's Trial Exhibit 294, unspecified testimony by Marni Gibson, and PSR ¶ 22. The loss amount of Ramer's offenses is not restricted to the asserted gain to one entity bearing Ramer's initial.[1] Both Government's Trial Exhibit 294 (a flowchart of investor funds) and PSR ¶ 22 (a chart used during Government's opening statement) show that Ramer's involvement was far more than "R&W Marketing" or Phase II of the scheme. Testimony and documentary evidence at trial established that Ramer was a salesman during all three phases of the scheme, and had a managerial role during the latter two phases.

**2.** The PSR properly increases Ramer's offense level by 2 points because, under § 2B1.1(b)(9)(C), the offense violated a "prior specific judicial or administrative order." (*See* PSR ¶ 54.) On August 7, 2013 and November 12, 2013, Kentucky's Franklin Circuit Court issued temporary restraining orders against Clementsville Oil, Liberty Oil, and Three Star (among others) which restrained "any person acting in active concert or participation with . . . these companies who receives actual notice of the court's order" from "making offers to sell and selling interests in oil and gas programs" and "dissipating

[1] *See* U.S.S.G. § 2B1.1, cmt. n.3 ("[L]oss is the greater of actual loss or intended loss," "actual loss means the reasonably foreseeable pecuniary harm," "[t]he court need only make a reasonable estimate of the loss," "[t]he court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined," and "the gain to an individual investor in the scheme shall not be used to offset the loss to another individual investor in the scheme.").

any monies received from investors in oil and gas programs." *See* Government's Trial Exhibits 57, 62.

Ramer sold royalty interests and managed the scheme after these judicial orders, although the mailing addresses eventually moved out of Kentucky and the scheme began operating under new company names. In phone calls and letters to victims, Ramer (and cold-callers that he supervised) cited the judicial orders as one of many explanations for these changes, for why victims had not yet received their guaranteed monthly payments, and for why those victims should invest more money.

**3.** The PSR properly increases Ramer's offense level by 2 points because, under § 2B1.1(b)(10), the offense "involved sophisticated means." (*See* PSR ¶ 55.) The scheme involved "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," § 2B1.1 cmt. n.8, including multiple aliases and email addresses, marketing brochures and promotional videos, virtual offices to receive mail and telephone calls, two telemarketing offices to cold-call victims, numerous bank accounts in different names, and shifting company names and company addresses across Kentucky, Tennessee, and California.

**4-5.** The pre-objections PSR dated August 4, 2015 properly found Ramer's total offense level, including the money laundering conspiracy count, to be 38. Under § 2S1.1(a)(1), the money laundering base offense level is "[t]he offense level for the

underlying offense from which the laundered funds were derived, if . . . the offense level for that offense can be determined." *See also* § 1B1.5(b)(1) ("An instruction to use the offense level from another offense guideline refers to the offense level from the entire offense guideline (i.e., the base offense level, specific offense characteristics . . .)"); *United States v. Harmon*, 409 F.3d 701, 707 (6th Cir. 2005) (explaining that the base offense level plus specific offense characteristics for an underlying wire fraud "then becomes the base offense level under the monetary transaction guideline, § 2S1.1(a)(1)").

Ramer's reliance on *United States v. Hanna*, 661 F.3d 271 (6th Cir. 2011) is misplaced. In *Hanna*, the appeals court held that it could determine the offense level for the underlying offense – shipping in violation of the Iraq embargo, which under those facts was a "base offense level" – and that therefore under § 2S1.1(a)(1) this underlying offense level would also be used as the base offense level for the money laundering conviction. *Id.* at 289-94. *Hanna*'s reference to this underlying "base offense level" does not hold or provide dicta that § 2S1.1(a)(1) refers in all cases only to the base offense level of the underlying offense, just as another court's reference to a convict's "red car" would not thereafter establish that a sentencing guideline only applies to red cars. Ramer's interpretation is also contrary to the sentencing guidelines and existing law.

The guidelines do, however, provide that Chapter Three's specific offense characteristics are not to be double-counted under § 2S1.1(a)(1), and are excluded from the money laundering base offense level, and "shall be determined based on the . . . laundering of criminally derived funds[] and not on the underlying offense." § 2S1.1

cmt. n.2(C). The final PSR dated August 28, 2015 has therefore properly reduced Ramer's base money laundering offense level by 3 levels to exclude the underlying mail fraud's 3-level manager or supervisor increase under § 3B1.1(b). (PSR ¶¶ 57, 60.)

Ramer's total money laundering offense level must then be increased by 3 levels to account for his managerial and supervisory role in the money laundering conspiracy. (PSR ¶¶ 63, 65.) Michael Hicks testified at trial that Ramer drove him to a bank in California and supervised him while he opened a bank account; the jury also saw video of Ramer sitting with Hicks at an account representative's table at that bank. Rosa Rivera testified that in addition to directing her distribution of illegal proceeds, Ramer instructed her to open and then transfer victim money into a new bank account under her own name, and then use that account to issue checks to investors as investment proceeds. Properly including this adjustment returns Ramer's total offense level to 38. (PSR ¶¶ 68, 70.)

**6.** Ramer's guideline sentence is appropriate "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Ramer's destructive and remorseless communications with the victims underscore the seriousness of his offense. Ramer's talent was to communicate – by creating marketing pamphlets and promotional videos, by scripting and organizing cold-calls, and by leading a field trip – the false promises that he knew could not be kept and had not been kept to any previous investors. The victims believed these promises that the wells were pumping oil and that previous investors were all

satisfied, and many wrote checks for money they could not afford to lose with the expectation of guaranteed oil production and monthly royalty income. Ramer's marketing materials also falsely cited geological surveys, due diligence reports, and state securities registration laws, thereby manipulating and undermining public confidence in the only tests of legitimacy that investors can depend upon to make investment decisions.

As supervisor of the cold-calling salesforce, Ramer personally and remorselessly dealt with many of these distraught victims, first as the enthusiastic "closer," and later as the confident "luller" who reassured worried investors. Ramer also used those lulling calls to convince existing victims to invest more money to help ensure the success of their initial investment, or to invest in different oil programs at a "discount" to make back the money they'd lost. Before his arrest, Ramer took some of these victims on a field trip to Kentucky to give them an advance opportunity to invest in a new oil field; many of them did invest and lost still more money. At trial, Ramer did not show contrition or in any way apologize to the testifying victims with whom he had spoken and traveled.

Ramer's guideline sentence is appropriate "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). It is not possible for law enforcement to identify and stop every criminal scheme in which numerous victims lose small amounts of money to remote fraudsters. Such schemes can only be deterred by giving notice of the punishment awaiting those fraudsters who are detected, investigated, and prosecuted; and such deterrence will be undermined if the weight of the punishment is inadequate compared to the potential rewards of a criminal scheme. Here, Ramer and his associates

divided up over $3,000,000. A severe punishment is necessary to deter the temptation to illegally acquire such a vast quantity of wealth.

Ramer's guideline sentence is appropriate "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). This is Ramer's first criminal conviction, but he has been investigated repeatedly over the past thirty years by state securities agencies, including a 1987 Iowa cease and desist order for a company called Argo, a 1989 Arizona cease and desist order for a gold company called R&T Metals, and a 2003 California cease and desist for an oil and gas company called Ram Energy. *See* Government's Trial Exhibits 361a-b, 363. These disciplinary actions gave Ramer knowledge of the illegality of his actions, but they did not deter his participation in this fraud, or in the other marketing schemes that his longtime employee, Rosa Rivera, described in her trial testimony.

Ramer is 76 years old, had back surgery in 1979 and heart surgery in 2003, and has walked with a cane since 1992, but that did not prevent him from playing a managerial role in this ambitious national fraud scheme over the past two years. (PSR ¶ 86.) *See also United States v. Tocco*, 200 F.3d 401, 434 (6th Cir. 2000) ("[E]ight judges of this court, still in service, are seventy years old or older. Many persons in business continue to serve in important capacities beyond seventy years of age."). The only way to end Ramer's career as a confidence man is to incapacitate him in prison.

For the reasons set forth above, the United States recommends the guidelines sentence of 235-293 months calculated by the U.S. Probation Office using the U.S. Sentencing Guidelines.

Respectfully submitted,

KERRY B. HARVEY
UNITED STATES ATTORNEY

By: s/ Kenneth R. Taylor
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4874
FAX (859) 233-2747
Ken.Taylor@usdoj.gov

By: s/ Neeraj K. Gupta
Assistant United States Attorney
260 W. Vine Street, Suite 300
Lexington, Kentucky 40507-1612
(859) 685-4843
FAX (859) 233-2747
Neeraj.Gupta@usdoj.gov

## CERTIFICATE OF SERVICE

On September 1, 2015, I electronically filed this motion through the ECF system, which will send the notice of electronic filing to:

David Guarnieri
*Attorney for Henry Ramer*

s/ Kenneth R. Taylor
Assistant United States Attorney